Gulf, Colorado & Santa Fe Railway Company v. J. T. Luther.

Decided November 8, 1905.

**1.—Cause of Action—Insulting Language—Mental Suffering.**

A carrier is liable for the consequences of mental suffering, humiliation, etc., caused by the language and conduct of an employe, even though no physical injury results from such wrongs.

**2.—Taking of Depositions—Presence of Interested Parties.**

While the presence and participation of interested parties during the taking of depositions is irregular, and perhaps improper, yet under the decisions of this State, in the absence of facts showing fraud, or actual injury to the opposite party, it was not ground for the suppression of the deposition.

**3.—Res Gestae.**

Remarks or exclamations of plaintiff's child, made while the carrier's servant was uttering the abusive language complained of, are admissible as parts of the res gestae.

**4.—Evidence—Expressions of Feelings.**

Where bodily and mental feelings are material to be proved, the usual expressions of such feelings, made at the time in question, are original evidence.

Appeal from the District Court of Hunt. Tried below before Hon. H. C. Connor.

*J. W. Terry* and *Perkins, Craddock & Wall,* for appellant.—"Because the verdict of the jury is contrary to the law and the evidence, and is excessive, in this, that it fails to show that the sickness and physical pain suffered by Mrs. Luther, if she was sick or suffered physical pain, was proximately caused by the negligence of the defendant. The undisputed testimony showed that her babe was about five weeks old; that at the time of the injury complained of she was in a weakened condition as a result of childbirth; that it was during the extreme hot weather in the month of August; that in order to get the train to Fort Worth she got up at 1 or 2 o'clock in the morning and went to the depot at Greenville and traveled some seventy or eighty miles before reaching Fort Worth, and the evidence leaves it in doubt as to whether she even had any breakfast on that morning. The undisputed evidence further shows that she got to Morgan, Texas, just before noon, and on the next day drove out to her mother's, some three or four miles in the country; that five days after her arrival at Morgan she came back to Greenville in response to a telephone message stating that her husband was sick; that she remained at Greenville only a few days, and then returned to Morgan and spent a week or two, during which time she was visiting around among her friends and relatives, traveling about in a buggy; that she then went back to Greenville and remained a few days, when she again returned to Morgan and spent some days before coming back to Greenville; that during all this time they did not deem her condition such as to require the calling of a physician. Further, the testimony of Mrs. Griffin to the effect that in the evening after her arrival at Morgan, Mrs. Luther was on the gallery at her sister's, talking and laughing; that at this time she showed no indication of sickness or nervousness, and that on several occasions before her return to Greenville Mrs Griffin saw

her, during all which time she heard no complaint and saw nothing to indicate that Mrs. Luther was sick, is not denied or attempted to be denied either by plaintiff, his wife, her mother or sister."

It is an unfair advantage for plaintiff and his counsel to be present and assist the notary and witness in the framing of answers to written interrogatories appended to a commission to take the deposition of the witness. The party who is not afforded an opportunity to be present by counsel is entitled to have the benefit of the answers of the witness in such form as they might have been given unaided by the assistance of plaintiff or of counsel. Under such circumstances, it will be presumed that the absent party was prejudiced. Rice v. Ward, 93 Texas, 537.

The court erred in overruling and in not sustaining defendant's objections to that part of the answer of Mrs. J. T. Luther to the sixth interrogatory, which is as follows: "The little girl, May, was very much frightened, and said, 'Mamma, let's get out of here,'" because the said answer was immaterial, irrelevant and hearsay.

This is not a suit for damages to the little girl by frightening or injuring her feelings, and the evidence was not material to any issue, and the objections as stated in the assignment should have been sustained.

The fifth assignment of error was as follows: The court erred in overruling defendant's motion to suppress that part of the answer to the fourth direct interrogatory of the witness, Mrs. Mollie Bailey, which is as follows. "She was complaining," because the same was not responsive to the interrogatory, and because the same was hearsay and self-serving.

The fourth direct interrogatory was as follows: "If you have answered that you were with or saw Mrs. Luther at the time inquired about, then state, if you know, what was her condition as to health and strength. Was she sick or well, and if you say she was sick, then state her condition, symptoms, appearance, how she was affected, if in any way, and whether or not she suffered with any ailment or ailments; if so, what was the nature of the same; how and in what way did she suffer, if at all, and in what way; what was her appearance as to health and strength? State fully and in detail."

The answer of the witness was: "She seemed to be weak and nervous. She was complaining. Can't say as to her symptoms, as I was not with her enough to say." Crosson v. Dwyer, 9 Texas Civ. App., 489, 30 S. W. Rep., 929; Gulf, C. & S. F. Ry. Co. v. Ross, 11 Texas Civ. App., 201, 32 S. W. Rep., 730; Missouri, K. & T. Ry. Co. v. Johnson, 95 Texas, 409.

The proposition under the sixth assignment of error was: Mere complaints made by a party as to his or her condition which are not exclamations, accompanied by and indicative of present pain, are not res gestae, but merely hearsay, and inadmissible. Gulf, C. & S. F. Ry. Co. v. Ross, 11 Texas Civ. App., 201, 32 S. W. Rep., 730; Missouri, K. & T. v. Johnson, 95 Texas, 409.

The seventh assignment of error was as follows: The court erred in overruling and in not sustaining defendant's objections, and in permitting plaintiff to answer the following questions asked him by his attorney, viz: "Before she got to Morgan, did she complain of suffering?". "What did she complain of?" which said question plaintiff

answered as follows: "After leaving Fort Worth, she complained mostly of her back," because the said answers were hearsay, self-serving, and not part of the res gestae.

*Evans & Elder,* for appellee.

NEILL, ASSOCIATE JUSTICE.—This suit was brought by appellee to recover damages for an alleged insult to his wife, made by a negro woman while in appellant's employ as a waitress in attendance on the ladies' waiting room in the passenger station of appellant at Fort Worth, Texas, and for alleged nervous prostration of appellee's wife caused by such insult.

The appellant answered by a general denial and specially that the negro woman was provoked to say what she did by opprobrious epithets addressed to her by appellee's wife.

The trial of the cause resulted in a verdict and judgment against the appellant for $2,500.

*Conclusion of Fact.*—It is undisputed that appellant owns and operates a line of railroad extending through Hunt County to Fort Worth, Texas, and another line of road extending from Fort Worth to Morgan, Bosque County, Texas; that it is and was in August, 1903, a common carrier of passengers using said lines of railway for such purpose; that during the month of August of the year aforesaid appellant, in connection with other common carriers of passengers, was in possession, control and use of a depot building on its roads in Fort Worth, Texas, for the use and accommodation of its passengers, in which there was a waiting room set aside for the reception of its lady passengers and children; that this room was then entrusted by appellant to a negro woman in its employ, the duties of whose employment were to keep the room clean and in good order for its passengers, attend their wants and minister to their comfort while awaiting passage on its trains.

That in the latter part of June, 1903, the plaintiff with his wife and four small children, having become passengers over appellant's said lines of road from a station in Hunt County to Morgan, Texas (the latter station being their destination), arrived at its depot in Fort Worth about seven o'clock in the morning for the purpose of taking one of its trains, which was due at 7:50 o'clock that morning. That plaintiff, being informed that the train was late, left his wife and children in the waiting room for women and children which was in charge of the negro woman in appellant's employ charged with the duties aforesaid, and went out into the city to attend to some matters of business.

The evidence is reasonably sufficient to prove that during plaintiff's absence from the depot the negro woman while in the discharge of her duties became very angry about one of the plaintiff's little children accidentally spilling from a cup some water on the floor, and when informed by the child's mother, plaintiff's wife, the spilling of the water by the child was unintentional, because the child did not know the water was in the cup, the negro woman turned upon Mrs. Luther, and what was said and done had best be told in her own language. "When I told the negro woman that the child didn't know the water was in the cup,

she turned on me with an angry look and said, 'The child did know the water was in the cup,' and I told her that the child did not know that the water was in the cup. Then she said to me, 'if you say the child did not know that the water was in the cup you are a liar.' I then said to her, 'I have not been accustomed to be treated this way by colored people.' She then replied, 'I am used to your kind, I meet up with them every day.' During the conversation she was standing right over me, shaking her finger right in my face, and looking vicious and angry. She stood over me about five minutes, and said many things to me that I can not remember as I was very much frightened at the time."

The negro woman testified differently as to what occurred, but as the testimony of Mrs Luther is corroborated by other circumstances and as the jury from its verdict, evidently believed her narration of the occurrence, we find it is true; that Mrs. Luther, in consequence of the abuse and ill treatment by the negro, was greatly frightened, humiliated, worried and distressed, causing her nervous prostration, physical pain and mental anguish to plaintiff's damage in the amount found by the verdict.

*Conclusions of Law.*—The first assignment of error complains of the court's overruling defendant's amended motion for a new trial upon the ground that the verdict is contrary to the law and evidence and is excessive in that it fails to show that the sickness and physical pain suffered by Mrs. Luther was proximately caused by the negligence of defendant.

The outrageous conduct and language of the negro woman, whether denominated negligence or not, were, because done by her while in the discharge of the duties of her employment, acts for which the appellant as a common carrier of passengers is responsible and liable to plaintiff for all the damages proximately flowing therefrom.

That plaintiff's wife suffered insult and indignity at the hands of appellant's servant, and was treated disrespectfully and indecorously by her under such circumstances as to occasion mental suffering, humiliation, wounded pride and disgrace there can be little doubt. At least the jury might have so found from the evidence before them. And if it should be conceded that she suffered no physical injury or sickness in consequence, still the appellant would be liable for the consequence of such wrongs done to a passenger.

In considering the duties of carriers to their passengers, Hutchinson on Carriers, sections 595, 596, states the rule as follows: "The passenger is entitled, not only to every protection which can be used by the carrier for his personal safety, but also to respectful treatment from him and his servants. From the moment the relation commences, as has been seen, the passenger is in a great measure, under the protection of the carrier, even from the violent conduct of other passengers, or of strangers. . . . The carrier's obligation is to carry the passenger safely and properly, and to treat him respectfully; and, if he entrusts the performance of this duty to his servants, the law holds him responsible for the manner in which they execute the trust. The law seems to be now well settled that the carrier is obliged to protect his passenger

from violence and insult from whatsoever source arising. He is not regarded as an insurer of his passengers' safety against every possible source of danger, but he is bound to use all such reasonable precaution as human judgment and foresight are capable of to make his passengers' journey safe and comfortable. He must not only protect his passengers against the violence and insults of strangers, and co-passengers, but, *a fortiori*, against the violence and insults of his own servants. If his duty to the passenger is not performed, if this protection is not furnished, but, on the contrary, the passenger is assaulted and insulted through the negligence or the willful misconduct of the carrier's servant, the carrier is necessarily responsible. And it seems to us it would be a cause of profound regret if the law were otherwise. The carrier selects his own servants, and can discharge them when he pleases, and it is but reasonable that he should be responsible for the manner in which they execute their trust."

Thompson on Negligence, section 3186, after stating the above rule, adds: "The carrier is liable absolutely, as an insurer, for the protection of the passengers against assaults and insults of his own servants, because he contracts to carry the passenger safely and give him decent treatment *en route*. Hence, an unlawful assault or insult to a passenger by his servant is a violation of his contract by the very person whom he has employed to carry it out. The intendment of the law is that he contracts absolutely to protect his passenger against the misconduct of his own servants whom he employs to execute the contract of carriage. The duty of the carrier to protect the passenger during the transit from the assaults of his own servants being a duty of an absolute nature, the usual distinctions which attend the doctrine of *respondeat superior* cut little figure in the case."

In Elliott on Railroads, section 2579, treating upon this subject it is said: "It is not merely a question of negligence in such cases, nor is it strictly a question depending upon the scope of the servants' particular employment. It is a question of the absolute duty of a railroad company to its passengers as long as the relation subsists and a breach of that duty on its part whether caused by the willful act of an employe or not. A carrier is bound to discharge the implied duty, arising out of its contract and imposed by law, that its passengers shall be protected from injury by its servants and shall not be willfully insulted and harmed by them, and if it commits the discharge of this duty to an employe it may well be held to do so at its peril, notwithstanding the exercise of care on its part in selecting the servants. Either the company or the passenger must take the risk of the infirmities of temper, maliciousness and misconduct of the employes whom the company has placed upon the train and to whom it has committed the discharge of its duty to protect and look after the safety of its passengers. A passenger has no control over them, and the company alone has the power to select and remove them. It is, therefore, but just to make the company, rather than the passengers, take this risk, and to hold it responsible. This leads to the conclusion that a railroad company is liable for an injury willfully inflicted upon a passenger by an employe while engaged in performing a duty which the carrier owes to the passenger, or in executing the contract, although the company is guilty of no negli-

gence in selecting them and such act was not strictly within the scope of their employment or line of their duty in the sense that it was done for the carrier or arose out of the performance of their particular duty." See, also, Knoxville Traction Co. v. Lane, 53 S. W. Rep., 558.

This rule is strictly observed in this State. In Dillingham v. Russell, 73 Texas, 51, it is said: "The rule," referring to the principle that the master is not ordinarily liable for an injury resulting from the willful and malicious acts of his agent not done in the course of his employment, "however, can not be applied in a case in which the master by contract, express or implied, is under obligation to protect the injured person from the servant's wrongful act as well as his own. Where a duty is thus imposed on the master, for whose acts, whether of omission or commission, resulting in injury to the person entitled to have the duty performed, the master must be held as fully responsible and liable to make at least actual compensation as though the act were his own personal act."

"In such cases if the servant does what the master could not suffer to be done without violation of the particular duty resting upon him, or if the servant omits to do that requisite to the full discharge of the master's incumbent duty, then the master must be held responsible for the servant's wrongful or malicious act or omission, for otherwise it would result that a master might relieve himself from obligation to perform a duty fixed by contract or otherwise by the employment of servants to conduct the business to which the duty attaches."

"The master's obligation can not thus be avoided, and whether the servant's act violative of the master's duty be willful or malicious is a matter of no importance in determining the liability and obligation of the master to make actual compensation to the injured person."

"It has been steadily held to be the duty of carriers of passengers to protect them, in so far as this can be done by the exercise of a high degree of care, from the violence and insults of other passengers and strangers and to protect them from the violence and insults of the carrier's own servants, and the inquiry whether this duty arises from contract or from the nature of the employment becomes unimportant, except that the duty goes with the carrier's contract, however made, whereby the relation of carrier and passenger is established." See, also, St. Louis S. W. Ry. Co. v. Franklin, 44 S. W. Rep., 702; Houston & T. C. Ry. v. Phillio, 69 S. W. Rep., 995, 96 Texas, 18.

The case of Texas & Pacific Ry. Co. v. Jones, 39 S. W. Rep. (Tex. Civ. App.), 124, is one where the plaintiff's wife, who was in defendant's depot for the purpose of taking passage on one of defendant's trains, was insulted by the wife of the ticket agent, but suffered no physical injury in consequence, and the question presented whether the husband could recover damages for her mental suffering. It was held that it was the duty of appellant's station agent to protect her from insult and abuse from all persons while she was at its station waiting to become a passenger on its train, and she had the right to recover for a breach of such duty whether she received physical injuries or not. Citing Leach v. Leach, 33 S. W. Rep., 703.

In the case of Houston, E. & W. T. Ry. Co. v. Perkins, 52 S. W. Rep.,

124., where the plaintiff and his wife were passengers in a Pullman sleeper attached to one of defendant's trains and at night the defendant permitted drunken men to enter the coach where plaintiff and his wife had retired, allowing the drunkards to remain and use profane and indecent language, which caused the wife mental anguish and loss of rest, this court held in an opinion by Justice Fly that the husband was entitled to recover damages though she sustained or suffered no physical injuries. See, also, Missouri, K. & T. Ry. Co. v. Ball, 61 S. W. Rep., 327.

The case of International & G. N. Ry. v. Henderson, 82 S. W. Rep., 1065, is one where a negro passenger, with the knowledge of the conductor, was vilified and made to dance for the amusement of the passengers by several drunken rowdies, who had entered the train; and though the evidence failed to show that he suffered any physical injuries a verdict against the railroad company for $1,000 damages on account of his humiliation, mortification and fright was affirmed on appeal. See, also, Quinn v. Louisville & N. Ry. Co., 32 S. W. Rep., 742.

We have quoted the foregoing elementary principles and cited cases falling under them for the purpose of demonstrating that the liability of a common carrier for insults by its servants causing humiliation, a sense of disgrace, mental anguish or fear in a passenger, is independent of physical injury or bodily harm, and that such liability does not depend upon the negligence of the master in employing the servant, or the scope of his authority, if the insult is given while employed about his master's business.

It being established by the decisions of this State that mental suffering is an element of damages where it results from a breach of the carrier's contract, though no physical injury may have been sustained, and as the evidence in this case shows plaintiff's wife suffered mental anguish from the consequence of such breach, which was also a tort, it was for the jury to determine the quantum of damage. In such a case the law does not undertake to, nor can it, exactly measure his damages, but it authorizes the jury to consider the injured feelings of the party, the indignity endured, the humiliation, wounded pride, mental suffering and the like, and to allow such sum as it may determine is right. When this is done, unless the verdict is palpably wrong, after it has been approved by the trial court, it is not the province of an appellate tribunal to disturb it.

What could be more humiliating to a frail, delicate, sensitive woman, with a babe at her breast and her other little ones around her than to be pounced upon, vilified and traduced by a negro servant in a railway depot where her relation as passenger to its owner entitles her to be treated with respect and kindness? Is it any wonder to those who can contemplate the effect of such an outrage that the poor woman, for months afterwards, as she testified, could not close her eyes without that angry, threatening negro arising before her and murdering sleep?

In Gulf, C. & S. F. Ry. Co. v. Trott, 86 Texas, 412, the Supreme Court says: "That a physical personal injury may be produced through emotion of the mind there can be no doubt. The fact that it is more difficult to produce such an injury through the operation of the mind

than by direct physical means affords no sufficient grounds for refusing compensation in an action at law, where the injury is intentionally or negligently inflicted. It may be more difficult to prove the connection between the alleged cause of injury, but if it be proved, and the injury be the proximate result of the cause, we can not say that a recovery should not be had."

It was for the jury to say from the evidence whether plaintiff's wife, in consequence of the outrage inflicted upon her by appellant's servant, suffered from nervous prostration and sickness, and there being evidence to support its finding, we deemed it our duty to make our conclusions of fact conform thereto, and in view of the evidence and the principles of law above enunciated to conclude that the verdict is not excessive. This disposes of the first and second assignments of error.

The third assignment complains of the court's overruling defendant's motion to suppress the deposition of Mrs. Luther, upon the ground that plaintiff and his counsel were present and assisted the notary and witness in framing the answers to written interrogatories appended to a commission to take the deposition.

It appears from the bill of exceptions taken by the defendant to the action of the court in overruling the motion that plaintiff and one of his counsel were present when the deposition was taken; that witness asked her husband about some immaterial matters, such as dates of birth of their children and dates of her leaving and returning home, which were called for in the interrogatories; that when the interrogatories were propounded and the answers were given, the attorney, without suggesting any matter to the witness, would request her to answer more fully; that sometimes the attorney, after the witness had answered, would frame the language in which it was reduced to writing by the notary; but never without the notary's being satisfied that the answer thus framed expressed the substance and meaning of the answer of the witness. It clearly shows that in answering the interrogatories as to what occurred between the witness and the negro woman in defendant's depot at Fort Worth, no suggestions were made by either plaintiff or his attorney and that her answers to such interrogatories were written out by the notary in the very language in which they were given by the witness. It appears that after her answers were reduced to writing they were signed and sworn to by her before the notary. It also appears from the record that the witness was in attendance on the trial and testified for plaintiff and was cross-examined by defendant's counsel on all the matters, save the altercation between the negro and her at the depot.

To our minds it appears from these facts that every inference of fraud in taking the deposition is repelled and that no possible actual injury to the defendant was done by the manner the deposition was taken. Therefore, we hold in the language of the trial judge, that "while the presence and participation of plaintiff's attorney was irregular and, perhaps, improper, yet under the decisions in this State, it was not such as to require the suppression of the deposition." Schunior v. Russell, 83 Texas, 83.

The fourth assignment complains that the court erred in not sustaining defendant's objection to that part of the answer of Mrs. Luther

to the sixth interrogatory which is as follows: "The little girl, May, was very much frightened and said "mamma, let's get out of here," because such part of the answer was immaterial, irrelevant and hearsay.

In regard to this, we will say that it appears from the record that a motion was made by appellant to suppress this part of the answer, and that upon considering the motion the trial court entered the following order: "Then came on to be heard so much of said motion as is to suppress portions of the answers of said witness" (referring to answers of Mrs. Luther) "to the sixth direct interrogatory; . . . and the same having been considered, is sustained as to the following portions of said interrogatory, . . . viz: "The little girl, May, was very much frightened and said to me, 'mamma, let's get out of here.'" It seems to us that if appellant really desired that this part of the answer be excluded, it only had to call the attention of the trial judge to the fact, manifest by the minutes of the court, that this part of the answer had previously been suppressed and therefore, no part of the deposition, and then to have objected to its being introduced on that ground; and having failed to do this, an assignment of error predicated upon another objection to its being read in evidence should not receive favorable consideration. However, we have no doubt that this part of the answer was admissible in evidence as part of the *res gestae,* and for that reason distinguishable from hearsay. For this appearance and exclamation of the child was when the negro was standing over and abusing her mother and were indicative of the woman's action and language and tended to show her violent and outrageous conduct toward plaintiff's wife. Greenl. Ev., sec. 108; Elliott Ev., secs. 154, 537, 550.

The testimony complained of in the fifth, sixth and seventh assignments was admissible in evidence under the rule that "where the bodily and mental feelings of an individual are material to be proved, the usual expressions of such feelings, made at the time in question, are original evidence. If they are the natural language of the affection, whether of body or mind, they furnish satisfactory evidence, and often the only proof of its existence. And whether they are real or feigned is for the jury to determine. Greenl. Ev., sec. 102. See, also, Elliott Ev., secs. 523, 524. And a witness may testify that another person seemed to be sick, suffering, nervous or in good or bad health. Elliott Ev., sec. 679.

While the rule, expressed in the court's charge, that "railway companies are not insurers of the safety and comfort of their passengers, but are required to exercise that high degree of care that very cautious and prudent persons would have exercised under the same or similar circumstances, and a failure to do so is negligence," may not be strictly applicable to a case of this character, its being given in the charge could not have possibly prejudiced the defendant, since in a case like this the common carrier is absolutely liable for injuries unlawfully and wrongfully inflicted by his servant on a passenger train.

There is no error in the judgment and it is affirmed.

*Affirmed.*

Writ of error refused.